## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LABORFEST, LLC AND LARRY WILLLIAMS** <br><br> **Plaintiffs** <br><br> **v.** <br><br> **CITY OF SAN ANTONIO, JOHN DOES UNKNOWN CITY EMPLOYEES SUED INDIVIDUALLY & LIVE NATION ENTERTAINMENT, INC & TICKETMASTER L.L.C.** <br><br> **DEFENDANTS** | § § § § § § § § § § § § § § § | **5:19-CV-00060-DAE** |

### <u>PLAINTIFF'S   AMENDED COMPLAINT</u>

TO THE HONORABLE COURT:

      LABORFEST, LLC AND LARRY WILLIAMS, Plaintiffs, complains of **CITY OF SAN ANTONIO, JOE DOES UNKNOWN CITY EMPLOYEES SUED INDIVIDUALLY & LIVE NATION ENTERTAINMENT, INC AND TICKETMASTER L.L.C**  defendants, and  for cause of  action shows:

*<u>Service of Process</u>*

1.  Service of Process may be had on the defendant at:

**CITY OF SAN ANTONIO**
**BY SERVING THE CITY CLERK**
**P.O. BOX 839966**
**SAN ANTONIO, TEXAS 78283**

**JOHN DOES UNKNOWN CITY EMPLOYEES SUED INDIVUDALLY**
**ADDRESS: UNKNOWN AT THIS TIME**


**LIVE NATION ENTERTAINMENT INC**
**REGISTERED AGENT: Corporate Creations Network Inc.**
**2425 W Loop South #200**
**Houston, TX 77027**

**TICKETMASTER LLC**
**REGISTERED AGENT: Corporate Creations Network Inc.**
**2425 W Loop South #200**
**Houston, TX 77027**


*Venue and Jurisdiction*


2.      Venue of this action is proper in the county of suit because the act's which give rise to

this suit occurred in Bexar County further the property the subject of this suit is also in Bexar

County

3.       Pursuant to Texas Rules of Civil Procedure, the Plaintiff herein makes a motion for a

discovery control plan in accordance with Rule 190.4 (Level 3).  Further, the Plaintiff requests

that the Court act as promptly as reasonably  possible on this motion

4.       Pursuant to Rule 47 of the Texas Rules of Civil Procedure the Plaintiffs are seeking

over a $1,000,000 in monetary relief.


*3.Statement of Facts*

5.       On March 4, 2016, the Plaintiffs and Defendants entered into an express written

contract for the use of the Henry B. Gonzalez Convention Center and grounds in San Antonio,

Texas.   The space was to be used for an event called "Labor Fest Bigger and Better" to occur in September of 2016.   Live Nation and Ticketmaster were supposed to be involved, pursuant to the City's contract with those companies, for selling tickets for the event.

6.      Plaintiff booked nationally known recorded artists.   Plaintiffs had previously held the event, which was wildly successful, at the "Sunken Gardens".    Plaintiffs intended this to be the breakout year of the event.

7.      The Contract in question called for the ticketing to be handled by Live Nation and Ticketmaster.   Unknown to Mr. Williams the City is not supposed to handle any ticket sales proceeds (with the exceptions of fees after the occurrence of the event) for any "field event". However, in this case, Mr. Williams has discovered that Ticketmaster send the deposits from Mr. Williams event directly to the Frost Bank account for the City.   Further, at the outset of the contract Mr. Williams requested that he be allowed to use his own ticketing company.   Mr. Williams was informed by City officials that Ticketmaster had to be used because of the exclusive contract the City had with Ticketmaster.   Mr. Williams has now learned that Ticketmaster did not have an exclusive agreement with the City related to the convention center and that Mr. Williams was free to use his own company.  Mr. Williams has further learned that the City of San Antonio officials monitoring ticket sales took off the "print at home" function so that tickets would have to be mailed customers at additional costs to the customers and profit to the City and so that Mr. Williams would not have the ability to monitor online sales in real time. The City also denied Mr. Williams   a direct Ticketmaster point of contact so that he would received a "client center" so that he could monitor all ticket sales live, be able to show investors the amount of funds received for financing purposes and be able to pay acts their deposits prior

to the performances.   All of these practices are common when using Ticketmaster.    Mr.
Williams is now aware of common practices dealing with the City and Ticketmaster  due to his
research of these issues.  However, he was not aware of these common practices at the time the
tickets were being sold.   He was being sent spread sheets and PDF's which we now know were
manipulated to under report ticket sales and proceeds.

8.     Plaintiffs complied with all terms of the contract.

9.     Further, As previously stated, Defendant, the City of San Antonio, began telling Plaintiffs
that the City, and not Live Nation/ Ticketmaster, were going to be responsible for the sales of
tickets for the event.   Plaintiff was confused by all of this, because the event was on the
Ticketmaster/Live Nation website.   The City, even though having no experience at doing this,
advised Plaintiffs they would develop their own program and way to sell the tickets.  Plaintiffs
have discovered that the tickets were in fact sold on Ticketmaster plaforms that were being
monitored and controlled by City officials.     As stated above, as part of the negotiations,
Plaintiff did ask if he could use his own ticketing company to sell the tickets.    The Defendant
City explained that they had a contract with Ticketmaster that required them to only use
Ticketmaster and they were not allowed to allow Mr. Williams or Laborfest to use any outside
vendor for ticketing.    Plaintiff now knows that this assertion by the city was false.

10.    In prior years, Plaintiffs had used their own ticketing company.   The program used by the
Plaintiff in prior years,  allowed for the Plaintiff to monitor ticket sales and for the immediate
placement of income for the sales into the Plaintiffs account for the payment of artists and
payment of vendors involved with the event.

11.    Even though the City asserted Ticketmaster's processing was different to the Plaintiff, the

4

event was on the Ticketmaster website, as previously stated and tickets appeared to be printed on Ticketmaster stock.     The Ticketmaster  site, however,  had stock pictures of performers that were not going to be on the event and did not advertise the nationally known acts that were going to attend.

12.    Plaintiffs complained, beginning in February of 2016, about the lack of information provided to Plaintiff by the City or Live Nation/Ticketmaster on sales and ability to monitor sales and the lack of and inaccuracy of the information put out on the web about the event. Further, the City refused to use tickets with scanners so that the tickets could be read and data about ticket sales could be tracked both before and during the event.

13.    In August of 2016, the City reported that only 342 tickets had sold resulting in only $32,000 in revenue.  In August of 2016,  the City (not Live Nation/Ticketmaster) wired to Plaintiffs  $25,000 for the initial income from the ticket sales.   There is nothing on the cover letter to indicate how the City came to this figure or any other figure.   Because of the problems, the Plaintiff demanded to take over ticket sales.

14.   Plaintiff has now discovered, that the figures from Ticketmaster relating to tickets sales and revenue are larger than those provided by the City.  Ticketmaster reveals that over 1000 tickets were sold generating revenue over $72,000.

15.    However, bank statements and reports from the City now clearly show that an estimated over 17,000 were sold generating revenue over $2,000,000.    These figures are taken from the bank deposits made into the Frost Bank account statements from the City provided to the Plaintiff.   Plaintiff, upon receipt of further information reserves the right to amend these figures. Of the $2,000,000 received Plaintiff only was provided $25,000 of the proceeds which the City

wired to Plaintiff and describes as a "deviation" form their normal practices.    However, the City should have never been in possession of any of these funds based the City's contract with Ticketmaster.

16.    In approximately August 8, 2016 the Plaintiffs took over the sales and marketing of the event.  In less than a month over 900 tickets were sold netting over $73,000.    However, Plaintiff has additionally learned that the Defendants, even though they were supposed to turn over the selling of tickets/ marketing to Laborfest,  continued to sell tickets and to generate income from Laborfest ticket sales virtually up to the date event.    A deposit into the City's Frost Bank account shows ticket sales between the last week of August and September 4, 2016 were over $65,000.

17.    Plaintiff has suspected that the City was not being truthful about the actual numbers of tickets sold and revenue.    By way of example, in the 2015 event sold over 3,000 tickets  netting over $140,000.

18.    As stated above, the City has an agreement with Live Nation/Ticketmaster which is a contract which states what is supposed to happen to funds for these sorts of events.  The contract forbids the City from doing the ticketing of these type of events.   As stated above, the City was trying to create its own ticketing service even though they used Ticketmaster to sell tickets for Plaintiff's event.    Plaintiff believes this is why many of the tickets recovered at the event were printed on "Ticketmaster" stock however are inconsistent with actual Ticketmaster Ticket Product from other event.    Further, tickets are sold in series starting with 1.   Each series is 1000 tickets.   Plaintiffs have recovered tickets with series numbers as high as 17.   This suggests that over 17,000 tickets or more were sold by the City and/or Live Nation/Ticketmaster.  This

has now been confirmed by bank documents and City reports on the event.

19.    The irregular nature of the tickets has to do with the Tickets not having proper bar codes on

them.   Plaintiff assets this was intentionally done so that Plaintiff would never be able to

determine the amount of tickets sold or to monitor the amount of tickets sold.   Tickets were

printed on different fonts and some appeared to be counterfeit.   As previously stated, this is why

the Plaintiffs wanted scanners and tracking that is typically used by the Plaintiff's ticketing

company and Live Nation/Ticketmaster.  Further, shipping charges and other costs on the face of

the tickets did not conform to any taxes, shipping costs or service fees or even the price of the

tickets that were agreed to in the contract and negotiations and the fees and service charges that

were agreed to between Ticketmaster and the City.    The City added money to the fees in order

to generate additional unearned revenue because the City was aware that all proceeds would be

forwarded to their Frost Bank account without the ability of the Plaintiff to monitor incoming

proceeds.   Although the additional charges to patrons would not have affected Plaintiffs overall

income from the event, this act is an outrageous act by the City in an attempt to take advantage

of the African American community who were the primary patrons of this event.

20.    As a result of the failure to properly track tickets sales and disburse funds to Plaintiffs,

Plaintiffs did not have funds to pay many of the acts that appeared to perform.   The event had to

be cancelled as to the headliners not being paid due to lack of funds.   As Plaintiff has now

discovered, this did not have to occur because there were more than enough funds to cover all

facets of the event and to net a seven figure profit to the Plaintiffs.    Plaintiff's budget for this

event was $400,000.   The deposits add up to over $2,000,000 which would net at least a $1.6

million dollar profit.

21.    After the disastrous results of the event due to the headliners not performing and the negative publicity that followed, the City   put out talking points for City officials to blame the Plaintiffs and Mr. Williams and essentially calling him a "con" artist.   Since the event, Plaintiffs promotional company has gone out of business and his reputation has been ruined.

22.    Thereafter, the City provided arbitrary refunds to customers who complained which did not correspond to ticket prices offered.   This has now been verified by bank statements that have been provided.

23.    On October 7, 2016, Plaintiffs finally discovered the depth of the fraud involved in this event.   On October 14, 2016, the City wrote a letter to Plaintiffs suggesting that only 848 tickets had sold for a total of $39,380 from March 2016 until August 2016 when Plaintiffs' company assumed control of sales.  In the letter, the City said that Ticketmaster was in charge of the ticketing process.   Plaintiffs assert this is factually inaccurate as the e-mails show that the City, in addition to Ticketmaster, was very involved or actually in control of the ticketing.

24.     In approximately December of 2018, pursuant to the discovery rule, and as part of Discovery in this case, Plaintiffs assert that documents were discovered which actually showed that the City was providing altered and false reports about ticket sales.   One report provided to Mr. Williams showed just over 300 tickets being sold.   However and chart below did not seem to verify the sales.  Analysis by an forensic accountant hired by the Plaintiffs shows that the chart below the sales total actually shows that over 15,000 tickets were sold and that almost a million dollars in revenue was generated.   The City's chart does not even correspond with the banking records that are now in the possession of the Plaintiffs.    However, it is still unknown at this time where the revenue went.

8

25.   Further, through research or prior City events, Mr. Williams has discovered in the past several months that the City often allowed other promoters who were not African-American to use their own ticketing companies.   After the failed event in 2016, the City held its own "Laborfest" simply appropriating the successful and widely known event.   Plaintiffs now believe that this was an accounting ploy to allow the Defendant to account for the additional proceeds that were gained in 2016 but were never given to Plaintiffs.

26.   Plaintiff asserts that the City discriminated against he and his company because they were African American not allowing him to use his own ticketing company with the intent to harm the only large African American promoter and promoted event and to put the event out of business so that they could appropriate the event for their own money making endeavors and have a vehicle to help them account for the additional funds kept from Plaintiffs 2016 event.

<u>*Causes of Action*</u>

<u>**Causes of Action as to City of San Antonio**</u>

*42 U.S.C. 1981- Discrimination as to Governmental Contract*

27.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).    Section 1981 is the present codification of section 16 of the one-hundred-and-forty-year-old Civil Rights Act of 1870, 16 Stat. 144, which was enacted pursuant to the federal legislative power to enforce the Thirteen Amendment's prohibition of slavery. *See Runyon v. McCrary, 427 U.S. 160, 180, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976); Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 459, 95 S. Ct.*

*1716, 44 L. Ed. 2d 295 (1975).* The Supreme Court has read § 1981 to prohibit racial

discrimination in the making and enforcement of private and governmental contracts against

nonwhites and whites alike. *Please See McDonald v. Santa Fe Trail Transp. Corp., 427 U.S.*

*273, 295, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976);  Please see Ndulue v. Fremont-Rideout*

*Health Grp., 2010 U.S. Dist. LEXIS 63189, at \*14-15 (E.D. Cal. 2010)*

28.    Plaintiffs assert, as stated above, that the Defendant City's failure to allow him to use his

private ticketing company was based on discrimination.   The evidence is now clear that he was

not required to use Ticketmaster and in fact the City, based on its contract with Ticketmaster,

should have never been in control of the Plaintiffs ticket revenue.   City officials intentionally

provided Plaintiffs with an outdated contract for the convention center with the intention of

misleading him as to his required use of Ticketmaster.  This was done so that the City would be

in control of what Plaintiffs saw relating to incoming revenue and ticket sales.   Further,

Plaintiffs will be able to show similarly situated events that were not being promoted by an

African American promoter were allowed to use their own ticketing companies and that the basis

for said action was racially based and motivated.

*42 U.S.C.§1983 and 14th Amendment to the United States Constitution*

29.    The evidence shows that the City either on its own or in concert with Ticketmaster sold

over 15,000 tickets amounting to over $2,000,000 in revenue.    The sales for the event, in part,

once costs were paid, belonged to the Plaintiffs.

30.    The Defendant City and their employees and have violated 42 U.S.C §1983 and the 14th

Amendment to the United States Constitution by illegally holding and converting the Plaintiffs

money and profits from Laborfest.  Said funds are the property of the Plaintiffs.

10

***Causes of Action as to Unknown City Employees in their Individual Capacity for Actions Under the Color of the State***

*42 U.S.C.§1983 and 14th Amendment to the United States Constitution*

31.    As of the Date of this filing, the Defendant City has provided bank statements which are highly redacted.   The Plaintiffs are unable to discern from the state statements any withdraws made by the City or any City employee in particular.   However, the evidence shows that the City or unknown City Employees  in concert with Ticketmaster sold over 17,000 tickets amounting to over $2,000,000 in revenue.    The sales for the event, in part, once costs were paid, belonged to the Plaintiffs.  Plaintiffs reserve the right to amend once it is discovered, which, if any, City employees took proceeds from the Frost Bank account which belonged to Plaintiffs.

32.     Because the Plaintiffs have not discovered the whereabouts of the missing funds, the Plaintiffs are still unaware of which government employees are responsible for the missing funds.  However, those unknown government employees in their individual capacities  have violated 42 U.S.C. §1983 and the 14th Amendment to the United States Constitution by illegally holding and converting the Plaintiffs money and profits from Laborfest.

*Texas Theft Liability Act*

33.   Plaintiffs assert that the unknown City Employees acting in their individual capacities have violated Chapter 134 of the Texas Civil Practices and Remedies Code.

34.   Violation of the Act has occurred because Unknown City Employees are holding funds in an unknown account.  However, regardless of where the funds are, the funds have been appropriated unlawfully.

11

***Causes of Action as to Ticketmaster/Live Nation***

*a) Breach of Contract*

35.     The contract is the above described  for the marketing and selling of tickets for the event to be conducted by Ticketmaster as part of their agreement with the City to control ticketing functions.    Therefore, Ticketmaster had a contractual obligation and duty by the contract the subject of this suit and by their agreement with the city to conduct the ticketsales and marketing for this event consistent with their common practices for other events.

1) Nature of the Contracts

The contract is the agreement as described above.  All items in the contract were either not completed, not done at all.

2) Terms of the Contract

 The contract called for Ticketmaster to conduct the sales and marketing for this event.

3)  Performance by Plaintiffs

Plaintiffs were and have performed all duties related to the contract.   Defendant  failed to complete the contract as per its terms

4) Breach of Contract

Plaintiff  asserts that the Defendant's failure to complete the contracts in accordance with its terms and conditions  are all  material  breaches  of  contracts above described and Plaintiffs seeks damages for all funds forwarded to the city in violation of their common contract with the City which are the funds of the Plaintiff.

*b)   Negligence*

36.      The Defendant Ticketmaster owed the Plaintiffs a duty under the contract to perform the work or to assure that the work  in a good and workman like manner and to assure that all services were provided on conducted in compliance with the contract and that all services were completed.   Further, Ticketmaster has a contract with the City which forbids the City from receiving any revenue from Plaintiffs event.   Defendant's clearly forwarded money directly to the city and the Defendants failed to provide  a "client center" to the Plaintiffs to monitor ticket sales and revenue.    Ticketmaster was responsible, at the very least, for the handling of the Plaintiffs funds and negligently forwarded fund the City in violation of their agreement with the City.  The City has now failed to forward these funds to the Plaintiff.   The Defendant breached their duty by  failing to perform the services in the  contract and failing to supervise those hired to perform the services and failing to follow its common practices with similarly situated events.  The breach of that duty has resulted  in the Plaintiffs potential loss of over $1,600,000 in ticket revenue, sponsorship, reputation, and business of the Plaintiffs.

*c)   Negligent Misrepresentation*

37.      Plaintiffs assert that the Defendant Ticketmaster  had  a duty to use reasonable care whenever they provided  information to the Plaintiffs  and that the above mentioned Defendants breached this duty when they misled the Defendant as to ticketsales.

38.       The breach of this duty by the defendant established that:

(1) the representations were made by a defendant in the course of their business, or in a transaction in which they had a pecuniary interest;

(2) the defendant supplied "false information" for the guidance of others in their business;

(3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and

(4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

*d)Fraud*

39.     The Plaintiffs also assert that the Defendant Ticketmaster made a misrepresentation of material Fact in their reports related to the tickets sales.     Numbers in the reports were altered either by Ticketmaster or city employees acting in their individual capacities in order to mislead the Plaintiffs as to the numbers of tickets sold and revenues.

40.     The Elements of Fraud as follows:

(1)   The defendant made a representation to Plaintiff

(2)   The representation was material

(3)   The representation was false or there was a duty to speak.

(4)   When the Defendant made the representation she knew it was false

(5)   The Defendant made the representation with the intent that the Plaintiff act on it.

(6)   The plaintiff relied on it and

(7)    The representation caused the Plaintiff injury

*Please see Insurance Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998); Johnson & Higgins, Inc. v. Kenneco Energy Inc., 962 S.W.2d 507, 524 (Tex. 1998)*

*f) Conversion*

41.   Plaintiffs  assert herein that the Defendant Ticketmaster  by acts above described converted and are still converting Plaintiffs money obtained by the tickets sales by sending said

14

funds to the City and that such conversion is and was malicious and the defendants conduct is of a wanton and malicious nature.

42.      Conversion is defined  as the wrongful exercise  of dominion and control over another's property in denial of or inconsistent  with his rights.   *Bandy v. First State Bank, 835 S.W.2d 609, 622 (Tex.1992)*. To recover exemplary damages for conversion, the Plaintiffs  must prove that the defendant acted with malice. *Southwestern Inv. Co. v. Alvarez, 453 S.W.2d 138, 141 (Tex. 1970)*.   Plaintiff  believes that the Defendants conduct described above and proof at trial would establish the essential elements described above.   Therefore, the Plaintiff seeks economic damages as a result of the conversion and punitive damages in an amount within the jurisdictional limits of the court found by a jury.

*g) Vicarious Liability as to all Defendants*

43.      Plaintiffs  assert that the Defendant Live Nation/Ticketmaster or the City of San Antonio (for the purpose of ticketing), was an employee or agent acting on behalf of the  Defendants, either on or both, at the time of the event and the sales of tickets.   Plaintiffs asserts that the City as agent of Live Nation/Ticketmaster or Live Nation/Ticketmaster as the agent of the city should be held liable for all acts or practices committed as alleged above because of the agent/employee relationship between the Defendants.

<u>Causation; damages</u>.

44.      The conduct of the Defendant City of San Antonio and Ticketmaster/Livenation described in the preceding paragraphs was the proximate cause of economic damages to  plaintiff.  The amount of plaintiff's damages exceeds the minimum  jurisdictional limits of the court.

15

45.     Plaintiffs asserts that the Defendants should be found jointly and severally liable for $1,600,000 for amounts of money not turned over to the Plaintiffs from ticket sales and for $ 6,400,000 for lost revenue from the failure to able to promote the event in 2017, 2018, 2019 and 2020.

46.     Plaintiff specifically seeks the lost money for tickets sold but not provided to Plaintiff or the lost potential revenue for tickets sales and vending for the loss of the event due to mismanagement of the ticket sales for the event which appears to be approximately $1,600,000.


### *Knowing and Intentional Conduct and Mental Anguish*

47.     Plaintiffs  assert  that   Defendants  were  aware, at the time of the act  or  practice complained or, of the falsity, deception or unfairness of the act or  practice giving rise to the claims above described.  Further,  Plaintiffs  assert that the Defendants  acts were intentional, the Defendants had the specific intent that the Plaintiffs  act  in  detrimental reliance on the falsity or deception  or  in   detrimental ignorance of the unfairness.   Further, Plaintiffs  assert  that the acts of the Defendants were the result of Fraud, Malice or were willful acts or omissions. Further, pursuant to 42 U.S.C. § 1981 & 1983 Plaintiffs seek mental aguish damages and punitive damages as allowed by the statutes.


### *Additional Statutory damages; exemplary damages*

48.     Further, Plaintiffs  assert  that the acts of the Defendant were the result of Fraud, Malice or were willful acts or omissions and seeks punitive damages as allowed for pursuant to State and Federal law.  Further, pursuant to 42 U.S.C. § 1981 & 1983 Plaintiffs seek mental aguish

damages and punitive damages as allowed by the statutes.

### *Mental Anguish; Punitive Damages*

49.    Plaintiffs  assert  that due to the knowing  nature  of  the  damages that the Plaintiffs have suffered Mental Anguish damages in  that he has lost work and suffered serious injury to his reputation and further, due to the potential loss of their business interest and loss of income. Plaintiffs continue  to  suffer Mental Anguish as a  result  of  the  damage  caused by the deception and that due to  the  intentional  nature  of this mental anguish cased by the Defendants.      Further, pursuant to 42 U.S.C. § 1981 & 1983 Plaintiffs seek mental aguish damages and punitive damages as allowed by the statutes.

50.    Pursuant  to Section 41.003 of the Civil Practice,  the Plaintiffs seek Exemplary Damages in the amount  of  two  times the amount of the economic damages   plus  an  amount equal to any noneconomic damages found by the jury not  to  exceed $900,000.   Plaintiffs also seek punitive and mental anguish damages pursuant to 42 U.S.C. §§ 1981 & 1983

### Attorney's Fees.

51.     Plaintiffs seek all reasonable and necessary attorneys'  fees  in this case which include the following:

   (a) Preparation and trial of this lawsuit; and

   (b) Post-trial, pre-appeal legal services; and

   (c) An Appeal to the 5th Circuit Court of Appeal; and

   (d) Making or responding to an application for writ of error to the United States Supreme Court  ; and

(e)  An  appeal to the United States Supreme Court  in  the  event application for writ and error is granted; and

(f)  Post-  judgment discovery and collection in  the  event  execution on the judgment is necessary.

Request for relief

52.   Plaintiffs demand  judgment against defendants  for all   damages  and attorney's fees; and all mental anguish, statutory additional or  exemplary damages as set forth above, costs of court and  prejudgment    and post-judgment interest at the highest lawful rates.

53.   Plaintiffs also asks for such other relief to which plaintiffs  may be entitled.

54.    Plaintiffs  pray that citation and notice issue  as  required  by law and that the Court  the relief requested  in  this  petition.

55.   Plaintiffs  pray for attorney's fees, expenses and costs.

56.   Plaintiffs pray for general relief.

57.     Plaintiffs, herein requests, in addition to damages awarded, that the Defendant be ordered to return all money or property found to be still in the possession of the Defendants.

Demand for Jury and Trial Setting

58.     Plaintiffs  demand  a jury trial.  Plaintiffs' jury  fee  is tendered with this petition and Plaintiffs requests that the Court  set  this issue for trial at earliest possible date available  to  the Court.

18

  Respectfully Submitted
*/s/Kenneth E. Grubbs*

_____

Kenneth E. Grubbs
Attorney for Plaintiff
SBN: 00798225
Forum Building
8000 IH-10 West, Ste 740
San Antonio, Texas 78230
(210) 490-1292
(210) 499-4587 (fax)
lawofficeofkennethgrubbs@gmail.com

CERTIFICATE OF SERVICE

      I hereby certify that on  May 24, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Janet Douvas Chafin
Jackson Walker L.L.P.
1401 McKinney, Suite 1900
Houston, TX 77010

Logan Lewis
Assistant City Attorney Litigation Division
100 W. Houston Street, 18th Floor
San Antonio, Texas 78205

   */s/ Kenneth E. Grubbs*
   Kenneth E. Grubbs

19